Alex R. Straus, SBN 321366
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212

*Plaintiffs' Attorneys*
*Additional attorneys on signature page*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRUCE HORTI, SANDRA GEORGE, and JEANETTE CRAIG, individually and on behalf of all others similarly situated, | Civil Action No.: |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| NESTLE USA, INC., a Company, | **JURY TRIAL DEMANDED** |
| Defendant. | |

**CLASS ACTION COMPLAINT**

# CLASS ACTION COMPLAINT

Plaintiffs Bruce Horti, Sandra George, and Jeanette Craig ("Plaintiffs"), through their undersigned attorneys, bring this First Amended Class Action Complaint against Defendant Nestle USA, Inc. ("Defendant"), individually and on behalf of all others similarly situated, and complain and allege upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

## NATURE OF THE ACTION

1.      This is a civil class action brought individually by Plaintiffs on behalf of consumers who purchased the following of Defendant's Products:

   a. BOOST Glucose Control,

   b. BOOST Glucose Control High Protein

   c. BOOST Glucose Control Max, nutritional supplement drinks (the "Products").

2.      The Products are sold online and in stores throughout the United States including at mass retailers such as Amazon.com, Walmart, Target, CVS, and on Nestle's own website.

3.      The Products are sold in lined bottles that prominently represented on the bottles themselves that the Products "help[s] manage blood sugar," and/or that they are "designed for people with diabetes." The name of the Products themselves, BOOST Glucose Control, is also a representation that it controls glucose. The main difference between BOOST Glucose Control, Glucose Control High Protein, and BOOST Glucose Control MAX is the level of protein which, which is 16 grams, 22 grams, and 30 grams, respectively.

4.      The advertising makes express or implied disease claims which would require prior testing and approval by the Food and Drug Administration ("FDA"), which Nestle has not obtained. The Products are mislabeled, and tricks reasonable consumers into believing that it can prevent and treat diabetes.

5.      Moreover, Defendant's express representations that the Products control glucose are deceptive. Defendant's representations are reasonably understood by consumers, and were understood by Plaintiffs, to mean that the Products affirmatively control their blood glucose levels:

**FIRST AMENDED CLASS ACTION COMPLAINT**

that it will make their glucose level better than prior to drinking it. But Defendant's own clinical trial concluded that the Products were associated with a lesser rise in glucose levels as compared to one other nutritional drink that was unidentified in the study. The Products do not control glucose, but rather produce a "less bad" response to glucose compared to one unknown product. That is not the same as controlling glucose. This is not what a reasonable person would understand from Nestle's representations that the Products is controls and manages glucose, and that it is designed specifically for diabetics.

6.     Nestle considers the Products to be Diabetes Specific Oral Nutrition Supplements, as explained in the clinical study (discussed more fully below) undertaken by the Nestle Nutrition Institute.

7.     Defendant's prominent and systematic mislabeling of the Products and its false and deceptive advertising form a pattern of unlawful and unfair business practices that harms the public and, if unstopped, could lead to substantial societal harm.

8.     Plaintiffs bring this suit to halt Defendant's unlawful sales and marketing of its Products and for damages they sustained as a result of the illegal sales and false and misleading marketing. Declaratory and injunctive relief is of particular importance given the likely consequences of Defendant's actions.

## PARTIES

9.     Plaintiff Bruce Horti is a resident and citizen of Concord California, Contra Costa County.

10.     Plaintiff Sandra George is a resident and citizen of Adelanto, California in San Bernardino County.

11.      Plaintiff Jeanette Craig is a resident and citizen of Kingston, New York in Ulster County.

12.     Defendant Nestle USA, Inc. ("Nestle") is a Virginia corporation with its principal place of business at 1812 N Moore St, Arlington, Virginia 22209. Nestle USA is the U.S. subsidiary of Nestle N.A., a Swiss multinational conglomerate that is the largest food company in

the world as measured by revenue. Defendant markets, distributes, and retails its Products throughout the United States, including in California and in this District, through brick-and-mortar stores, and at through numerous retailers online.

## JURISDICTION AND VENUE

13. This Court has personal jurisdiction over Defendant. Defendant purposefully avails itself of the California consumer market and distributes the Products to hundreds of locations within this District and thousands of locations throughout California, where the Products are purchased by consumers every day.

14. This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed Plaintiffs class, any member of the Plaintiffs class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiffs alleges that the total claims of individual members of the proposed Classes (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

15. Venue is proper in this District under 28 U.S.C. § 1391(a). Plaintiff Horti lives in and made purchases of Products in this District, substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District and the Defendant conducts business in this District.

## FACTUAL ALLEGATIONS

16. At all relevant times, Defendant has marketed its Products in a consistent and uniform manner. Defendant sells the Products in all 50 states on its website and through various distributors and retailers across the United States.

### Diabetes in The U.S.A.

17. Diabetes is a serious chronic disease that stems from the body's inability to properly

**FIRST AMENDED CLASS ACTION COMPLAINT**

regulate blood sugar (glucose), due to problems with the body's production and use of the pancreas-produced hormone insulin. Insulin's role is to regulate the absorption of glucose from the blood into the cells for use as energy. When the body's ability to make and/or utilize insulin is compromised, too much glucose remains in the blood, leading to significant health problems. There are three types of diabetes:

    a.   Type 1: this results when the body does not produce enough insulin, resulting in high levels of glucose in the blood. People with Type 1 diabetes are typically diagnosed as children and must take insulin externally to manage their condition. Type 1 diabetes accounts for 5%-10% of diabetes in the United States. [1]

    b.   Type 2: accounting for 90%-95% of all diabetes cases, Type 2 diabetes develops typically later in life than Type 1, and results not from the body's lack of insulin but from the body's inability to keep blood sugar at normal levels using the insulin that is produced, often because of the body acquiring insulin resistance. *See e.g. id.* Type 2 diabetes often, but nor always, results from unhealthy weight.

    c.   Gestational Diabetes: develops during pregnancy in pregnant women who have never had diabetes outside of pregnancy. The condition typically disappears after pregnancy. *See id.*

18.    Diabetes of all types are a serious disease whose damaging effects increase over time. Diabetes symptoms typically include: frequent urination, thirst that is difficult to quench, hunger, blurred vision, fatigue, dry skin, slow healing sores, more than the normal number of infections.

19.    Diabetes often leads to more serious symptoms including death from increased risks of cardiac events, or from organ failure. According to the U.S. Center for Disease Control (CDC) diabetes is a leading cause of death and serious health complications in the U.S., and Type 2 diabetes in particular has been growing rapidly in the United States. The CDC's website reports as follows:

---

[1]    *See* https://www.cdc.gov/diabetes/basics/diabetes.html (last visited October 25, 2021).

**FIRST AMENDED CLASS ACTION COMPLAINT**

- 34.2 million US adults [more than 10% of the entire population of the U.S.] , have diabetes, and 1 in 5 of them don't know they have it.

- Diabetes is the seventh leading cause of death in the United States.

- Diabetes is the No. 1 cause of kidney failure, lower-limb amputations, and adult blindness.

- In the last 20 years, the number of adults diagnosed with diabetes has more than doubled.[2]

20. There has been significant reporting on the growing dangers of Type 2 diabetes in the general media over the past several years, leading to awareness of the disease among American consumers.

21. In addition to diagnosed diabetes, 88 million American adults (1-in-3 Americans) are "prediabetic," which the CDC defines as follows:

Prediabetes is a serious health condition where blood sugar levels are higher than normal, but not high enough yet to be diagnosed as type 2 diabetes. Approximately 88 million American adults—more than 1 in 3—have prediabetes. Of those with prediabetes, more than 84% don't know they have it. Prediabetes puts you at increased risk of developing type 2 diabetes, heart disease, and stroke.[3]

22. People with Type 2 diabetes typically are prescribed medications to control their blood glucose levels, while Type 1 diabetics typically also are prescribed insulin, often in combination with other medications:

You may be able to manage your diabetes with healthy eating and being active, or your doctor may prescribe insulin, other injectable medications, or oral diabetes medicines to help manage your blood sugar and avoid complications. You'll still need to eat healthy and be active if you take insulin or other medicines. It's also important to keep your blood pressure and cholesterol close to the targets your doctor sets for you and get necessary

---

[2] *See* https://www.cdc.gov/diabetes/basics/diabetes.html (last visited October 25, 2021).

[3] *See* https://www.cdc.gov/diabetes/basics/prediabetes.html (last visited October 25, 2021).

**FIRST AMENDED CLASS ACTION COMPLAINT**

screening tests.[4]

23.     While the mechanism of action among these prescription medications differ, all of them ultimately seek to control and manage blood glucose levels, because it is the level of glucose in the blood that defines diabetes: a diagnosis of diabetes, or prediabetes, is triggered by measuring the level of glucose in the blood.

24.     For example, Lantus, the best-selling diabetes medication (and the 5th best-selling medication worldwide), advertises its ability to control blood glucose as follows:

> If your doctor said it's time for insulin, it's important to understand your options. Insulin is a hormone made in your body. If your doctor mentioned insulin, it can mean your body is no longer making, or is having trouble using, its own insulin. Millions of people count on once-daily Lantus®, as well as other diabetes medicines made by Sanofi, to help lower their blood sugar. Learn more below, then talk to your doctor to find out which insulin treatment may be right for you.[5]

25.     Similarly, Farxiga, another top selling medication for Type 2 diabetes, represents that it is used to "improve blood sugar control along with diet and exercise." [6]

26.     With the dramatic rise of diabetes and prediabetes, companies have tapped into consumer anxieties about preventing and treating diabetes and prediabetes. This action is brought because of Defendant's deceptive advertising and misbranding of an over-the-counter [nutritional supplement] protein drink.

## I.     Defendant Makes Improper Health Claims

27.     Food manufacturers are required to comply with state and federal laws and regulations that govern the labeling of food products. Among these is the Food Drug & Cosmetic Act, 21 U.S.C. § 301 *et seq* ("FDCA") and its labeling regulations, including those in 21 C.F.R. § 101.

---

[4]     See https://www.cdc.gov/diabetes/basics/type2.html (last visited October 25, 2021).
[5]     https://www.lantus.com/new-to-insulin/starting-insulin (Last checked October 25, 2025).
[6]     https://www.farxiga.com/ (Last checked October 25, 2025).

**FIRST AMENDED CLASS ACTION COMPLAINT**

28.     California's Sherman Law has expressly adopted the federal labeling requirements as its own and indicated that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food regulations of this state." California Health & Safety Code § 110100.

29.     As alleged herein, Defendant has violated the FDCA, the Sherman Law, and consumer protection statutes.

30.     The Products are represented on the front of their labels to be "nutritional drink[s]." As such they are "food" pursuant to 21 U.S.C. § 321(f), and the products as a whole and their ingredients are "substances" pursuant to 21 CFR § 101.14(a)(2), and such as Defendant may not make health claims about the Products unless such claims are expressly reviewed and preauthorized by the FDA. *See* 21 C.F.R. 101.14(e). A product that makes unauthorized health claims is misbranded pursuant to 21 USCS § 343(r). Pursuant to the California Sherman law, "[i]t is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded." Cal. Health & Saf. Code § 110760.

31.     Cal. Health & Safety Code § 110760 (Deering, Lexis Advance through Chapter 1-100, 102, 103, 105-112, 114, 115, 117-123, 125-142, 145-160, 164, 173, 174, 177, 180-184, 276, 294, and 307 of the 2021 Regular Session, including all urgency legislation effective July 22, 2021 or earlier)

32.     A health claim is "any claim made on the label or in labeling of a food, including a dietary supplement, that expressly or by implication . . . characterizes the relationship of any substance to a disease or health-related condition." 21 C.F.R. § 101.14(a)(1). Substance "means a specific food or component of food. . ." 21 C.F.R. § 101.14(a)(2). "Disease or health-related condition means damage to an organ, part, structure, or system of the body such that it does not function properly . . . or a state of health leading to such dysfunctioning." 21 C.F.R. § 101.14(a)(5).

33.     The Products are foods, and diabetes is disease and/or health-related condition.

34.     Defendant makes the following health claims right on bottles themselves and on the packaging of the multi-packed bottles:

      a.   "Designed for people with diabetes" (indicate only 2 of the 3 advertise this if MAX doesn't). This is an implicit or express health claim: it denotes a relationship between the drink and diabetes, and reasonable consumers could only understand this to mean that the Products prevent diabetes or mitigates the negative effects of diabetes.

      b.   The name of the Products: "BOOST Glucose Control," is an implicit or express health claim because it purports to control a health-related condition, namely the inability to control glucose, which describes diabetes. Reasonable consumers could only understand this to mean that the Products prevent diabetes or mitigate the negative effects of diabetes.

      c.   "Helps manage blood sugar is an implicit or express health claim because it purports to control a health-related condition, namely the inability to manage glucose, which describes diabetes. Reasonable consumers could only understand this to mean that the Products prevent diabetes or mitigate the negative effects of diabetes.

35.     The   BOOST Glucose Control and BOOST Glucose Control High Protein represent[ed] as follows on the bottles themselves:

**FIRST AMENDED CLASS ACTION COMPLAINT**



36. BOOST Glucose Control MAX appears as follows:

**FIRST AMENDED CLASS ACTION COMPLAINT**



37.     The Products come in a variety of sizes and are commonly sold in multi-pack paper containers. The multi-pack packaging contains the same representations as are also made on the individual bottles enclosed:



38.     Products [except MAX] have represented that they are "designed for people with Diabetes." Plaintiffs purchased Products and relied on the representation that it was "designed for people with diabetes," and on the representations that BOOST Glucose Control effectively controls glucose and helps manage blood sugar, representations which are made on the Products.

39.     It appears that Nestle may be in the process of transitioning away from making the

FIRST AMENDED CLASS ACTION COMPLAINT

"designed for people with diabetes" representation. On its website, Nestle currently shows a graphic indicating a "new look" for the Glucose Control Products, which shows that "designed for people with diabetes" has been replaced with "helps manage blood sugar," which is independently actionably deceptive as alleged herein:



40.     On the Walmart website, as of October 28, 2021, the "new look" packaging is described as "coming soon," indicating that the new packaging is not yet in the stream of commerce.

**FIRST AMENDED CLASS ACTION COMPLAINT**



41.     Nestle has been selling the Products expressly for "people with diabetes" for a long time, and it is still, as of October 26, 2021, specifically targeting the Products for people with diabetes. On the ubiquitous Google search engine, searching for "BOOST Glucose Control" returns ads sponsored by Nestle as the top search result on October 25, 2021, and October 26, 2021, respectively, which highlight prominently that they are meant for diabetics, and evidence that Nestle is targeting the Products specifically to people concerned about diabetes:

**FIRST AMENDED CLASS ACTION COMPLAINT**

- **BOOST Glucose Control® Drinks | Nutrition For Diabetics**

  https://www.**boost**.com/**boost**/--

  [Ad] Purchase **BOOST Glucose Control®** Online Today . Free Shipping Over $49.95. Comes With 16 g High-Quality Protein And 25 Vitamins & Minerals!

  **Types**: **BOOST**® Original, **BOOST**® High Protein, **BOOST** Plus®, **BOOST Glucose Control®**


**BOOST® Drinks For Diabetics | Tailored Nutrition**

https://www.**boost**.com/**boost**/--

[Ad] Purchase **BOOST Glucose Control®** Online Today . Free Shipping Over $49.95. Comes With 16 G High-Quality Protein And 25 Vitamins & Minerals!

Gluten Free · Buy Online · Free Shipping Over $49.95 · Balanced Nutrition

**Types**: **BOOST**® Original, **BOOST**® High Protein, **BOOST** Plus®, **BOOST Glucose Control®**

42.     The "new look" packaging contains the same health claims, representing that the Products can be used for "glucose control" and that it "helps manage blood sugar."

43.     When Defendant's claims are viewed in their totality, they are either explicitly or implicitly claiming to prevent disease and/or treat disease, which makes the product attractive to people that wish to lower their risk of becoming diabetic or prediabetic, and is also attractive those that are already diagnosed and wish to mitigate their diagnosed diabetes or diagnosed prediabetes.

44.     The *sine qua non* of diabetes is the body's inability to properly manage blood glucose. A nutritional drink that claims to manage and control blood glucose levels, particularly one that also represents that it is "designed for people with diabetes" is representing to reasonable consumers that it can prevent and treat diabetes.  As demonstrated above, the glucose control claims on the Products closely match the language in advertisements for FDA approved prescription diabetes medications.

45.     These claims mislead consumers into believing reasonably that they can use the Product to prevent and treat diabetes.

46.     Pursuant to FDA regulations, express or implied health claims must be specifically preauthorized by the FDA. *See* 21 C.F.R. § 101.14(e). The health claims made by Defendant were not authorized, and are therefore misbranded pursuant to 21 USCS § 343(r).

**FIRST AMENDED CLASS ACTION COMPLAINT**

## II.    The Products Are Unapproved New Drugs

47.    Pursuant to 21 U.S.C. § 321(g)(1), a drug is defined as any "article[s] intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals."

48.    As alleged above, the Products are expressly marketed to diabetics. The Products represented that they are "designed specifically for people with diabetes." The Products also purport to control and/or manage blood glucose, which is a representation that they treat diabetes because that is what diabetes is: an inability to manage blood glucose naturally.

49.    Pursuant to 21 U.S.C. § 355(a), new drugs cannot be sold without prior approval from the FDA. This has not been obtained by Nestle for the Products.

50.    The Products are misbranded drugs, and their marketing and sale violates 21 U.S.C. § 331(a).

## III.    The Products Deceptively Represents That It and Controls and Manages Blood Glucose

51.    As alleged above, the Products purports to control blood glucose. It does this by the representations on the bottle seen by anyone who buys it. The name of the Products, "Boost Glucose Control" represents prominently that it controls glucose, which is reinforced by the separate representation that it "helps manage blood sugar."

52.    Representations that a Products controls glucose and "helps manage blood sugar" conveys to a reasonable consumer that the Products affirmatively does something to control blood sugar: that whatever one's blood glucose is at the time they take the Products, drinking the Products will make it better. This is the way in which Plaintiffs and all other class members reasonably understood the representation.

53.    But this reasonable understanding is false, as demonstrated by the clinical study that Nestle discusses on a part of its website:

BOOST Glucose Control® Drink is clinically shown to produce a lower blood sugar response vs. a standard nutritional drink in people with type 2 diabetes. Not a substitute for medication.

BOOST Glucose Control® | BOOST® (last visited October 25, 2021).

54. Upon information and belief, Nestle's claims that the Products controls blood glucose is ostensibly backed by a single clinical study which compared the glucose response of 12 clinical trial participants with type 2 diabetes after drinking "BOOST Glucose Control® Nutritional Drink," and an unidentified "standard oral nutritional supplement" (ONS). The study abstract does not say that the High Protein or the MAX BOOST drinks were also tested. The study was done by the Nestle Nutrition Institute, which, upon information and belief is funded by and/or directly or indirectly affiliated with defendant Nestle. BOOST Glucose Control is described in the study as a "Diabetes Specific Oral Nutritional Supplement (DS-ONS)." The study concluded that the rise in glucose levels was lower when the subjects drank the Products versus the ONS. According to the Abstract Summary for the Products (Exhibit A), the conclusions are:

> Conclusions:
>
> DS-ONS attenuated the overall blood glucose response and produced lower postprandial blood glucose peaks compared to a standard ONS.
>
> Specially formulated DS-ONS can be a useful tool to provide nutritional support as part of an overall diabetes management plan in individuals with T2D.

Exhibit A.

55. According to the study, the DS-ONS caused blood glucose levels to go up.

56. Accordingly, contrary to the representations on each of the Products, Nestle BOOST (let alone BOST High Protein and BOOST MAX, which were not tested) does not control glucose in a way that such claim is reasonably understood, it simply provokes a *less bad* glucose response.

57. Leaving aside whether the conclusion of this small (12 person), non double-blind study are scientifically valid, taking the conclusions at face value at most shows that BOOST Glucose Control leads to a smaller glucose spike than a single, unidentified nutritional drink. This is like a winery advertising prominently that its wine controls blood alcohol levels when all the winery can show is that its wine is less bad than tequila.

58.     A lowered glucose response can be achieved by lowering the sugar content. While Plaintiffs cannot know what unidentified ONS was compared against the Products, Nestle makes several drinks including Original BOOST, which contains 20 grams of sugar as compared with 4 grams of sugar for BOOST Glucose Control. Even if this was the only difference between Original BOOST and BOOST Glucose Control, the latter would produce a lesser glucose spike.

59.     Plaintiffs and class members bought the Products because they believed that they was scientifically proven to keep their blood glucose levels in control, Nestle's own testing show it does not do: it causes glucose levels to rise.

60.     Defendant's false, deceptive and misleading label statements violate 21 U.S.C. § 343(a)(1) and statutes adopted by many states deeming food misbranded when "its labeling is false or misleading in any particular."

61.     Defendant's false, deceptive and misleading label statements are unlawful under State Unfair and Deceptive Acts and Practices Statutes and/or Consumer Protection Acts, which prohibit unfair, deceptive or unconscionable acts in the conduct of trade or commerce.

62.     Further, as explained above, Defendant's claims are misleading to consumers in violation of 21 U.S.C. § 343, which states, "A food shall be deemed to be misbranded—False or misleading label [i]f its labeling is false or misleading in any particular."

63.     The California Sherman Law explicitly incorporates by reference "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the FDCA," as the food labeling regulations of California Cal. Health & Saf. Code, § 110100, subd. (a). Thus, a violation of federal food labeling laws is an independent violation of California law and actionable as such.

64.     Under the New York Food, Drug and Cosmetic Act, New York has expressly adopted the federal labeling requirements of the Act. Thus, a violation of federal labeling laws is an independent violation of New York law and actionable as such.

**Plaintiffs' Experiences**

**Bruce Horti**

**FIRST AMENDED CLASS ACTION COMPLAINT**

65.     On or about March 10, 2020, Mr. Horti purchased the Boost Glucose Control Rich Chocolate and Very Vanilla flavors from a Costco in Concord, California, and a Walmart in Martinez, California. Although the Products were more expensive than other choices he viewed, Mr. Horti chose to pay the premium price based upon the various claims and promises made by Nestle regarding the Products' diabetes-related representations (as identified above), including the representations that it controls and manages glucose levels. At the time of his purchase, Mr. Horti relied on Nestle' diabetes-related factual representations on the Products' label. All of the diabetes-related representations made by Nestle regarding the Products purchased by Mr. Horti are false because Nestle did not receive FDA approval for such claims and the claims viewed in their totality implicitly or explicitly claim to mitigate, prevent disease, and because the Products do not control or manage glucose levels These claims, alone or in tandem, are deceptive and violate federal regulations.

**Sandra George**

66.     On or about September 20, 2021, Ms. George purchased the Boost Glucose Control Products from a Walmart and CVS in Adelanto and Santa Fe Springs, California. Although the Products were more expensive than other choices she viewed, Ms. George chose to pay the premium price based upon the various claims and promises made by Nestle regarding the Products' diabetes-related representations (as identified above), including the representations that it controls and manages glucose levels. At the time of her purchase, Ms. George relied on Nestle' diabetes-related factual representations on the Products' label. All of the diabetes-related representations made by Nestle regarding the Products purchased by Ms. George are false because Nestle did not receive FDA approval for such claims and the claims viewed in their totality implicitly or explicitly claim to mitigate, prevent disease, and because the Products do not control or manage glucose levels These claims, alone or in tandem, are deceptive and violate federal regulations.

**Jeanette Craig**

67.     On or about October 12, 2021, Ms. Craig purchased the Boost Glucose Control Products from a Sam's Club in Kingston New York. Although the Products were more expensive

than other choices she viewed, Ms. Craig chose to pay the premium price based upon the various claims and promises made by Nestle regarding the Products' diabetes-related representations (as identified above), including the representations that it controls and manages glucose levels. At the time of her purchase, Ms. Craig relied on Nestle' diabetes-related factual representations on the Products' label. All of the diabetes-related representations made by Nestle regarding the Products purchased by Ms. Craig are false because Nestle did not receive FDA approval for such claims and the claims viewed in their totality implicitly or explicitly claim to mitigate, prevent disease, and because the Products do not control or manage glucose levels These claims, alone or in tandem, are deceptive and violate federal regulations.

## CLASS ACTION ALLEGATIONS

68.     Plaintiffs bring this class action lawsuit on behalf of themselves and proposed Classes of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

69.     Plaintiffs seek certification of the following Classes:

**California Class:** All persons in the State of California who purchased the Products (the "California Subclass") for personal use and not for resale.

**New York Class:** All persons in the State of New York who purchased the Products (the "New York Subclass") for personal use and not for resale.

70.     Members of the classes described are referred to as "Class Members" or members of the "Classes."

71.     The following are excluded from the Classes: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

**FIRST AMENDED CLASS ACTION COMPLAINT**

72.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

73.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that individual joinder of all Class Members is impracticable. On information and belief, Class Members number in the thousands to millions. The precise number or identification of members of the Classes are presently unknown to Plaintiffs but may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

74.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Classes, which predominate over any questions affecting individual members of the Classes. These common questions of law or fact include, but are not limited to, the following:

a.     Whether the Products contents are mislabeled as dietary supplements, and are being sold in violation of the FDCA;

b.     Whether Defendant is explicitly or implicitly claiming that its Products can mitigate or prevent a disease or class of diseases in violation of the FDCA and DSHEA;

c.     Whether Defendant's Products are misbranded because their labelling fails to include adequate directions for use;

d.     Whether Defendant knowingly made misleading statements in connection with consumer transactions that reasonable consumers were likely to rely upon to their detriment;

e.     Whether Defendant knew or should have known that the representations and advertisements regarding the Products was false and misleading;

f.     Whether Defendant's conduct violates public policy;

g.     Whether Defendant's acts and omissions violate California law;

h.     Whether Defendant's acts and omissions violate New York law;

**FIRST AMENDED CLASS ACTION COMPLAINT**

i. Whether Plaintiffs and the Class Members did not receive the benefit of their bargain when purchasing the Products;

j. Whether the Plaintiffs and the Class Members suffered monetary damages, and, if so, what is the measure of those damages;

k. Whether Plaintiffs and the Class Members are entitled to an injunction, damages, restitution, equitable relief, and other relief deemed appropriate, and, if so, the amount and nature of such relief.

75. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and the other Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

76. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other Class Members because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each Class Member were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

77. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate representatives of the Classes because they are members of the Classes and their interests do not conflict with the interests of the Class Members they seek to represent. Plaintiffs have also retained counsel competent and experienced in complex commercial and class action litigation. Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of all Class Members. Accordingly, the interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

78. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The

**FIRST AMENDED CLASS ACTION COMPLAINT**

damages or other financial detriment suffered by Plaintiffs and the Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 et seq. ("UCL")**
**(On Behalf of Plaintiffs Bruce Horti, Sandra George, and the California Class)**

79.     Plaintiffs Bruce Horti, Sandra George, reallege ("Plaintiffs" for the purposes of this section) and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

80.     Plaintiffs brings this claim individually and on behalf of all members of the California Subclass against Defendant.

81.     The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

82.     The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute business acts and practices.

83.     <u>Unlawful</u>:  The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

        a.     The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

        b.     The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;

        c.     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*; as

incorporated into California law in the Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq.*

84.   Unfair: Defendant's conduct with respect to the labeling, advertising, and sale of the Products was "unfair" because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to their victims.

85.   Defendant's conduct with respect to the labeling, advertising, and sale of the Products was and is also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not limited to the applicable sections of the Consumers Legal Remedies Act, the False Advertising Law, the FDCA, and the California Sherman Food, Drug, and Cosmetic Law.

86.   Defendant's conduct with respect to the labeling, advertising, and sale of the Products was and is unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumer themselves could reasonably have avoided.

87.   Fraudulent:  A statement or practice is "fraudulent" under the UCL if it is likely to mislead or deceive the public, applying an objective reasonable consumer test.

88.   As set forth in detail above, Defendant has fraudulently misbranded and mislabeled in violation of the FDCA; and has made false and misleading statements that are likely to mislead reasonable consumers to believe the Products have been scientifically established to be effective, which they have not been

89.   Defendant profited from its sale of the falsely, deceptively, and unlawfully advertised and packaged Products to unwary consumers.

90.   Plaintiffs and Class Members are likely to continue to be damaged by Defendant's deceptive trade practices, because Defendant continues to disseminate misleading information on the Products' packaging.  Thus, injunctive relief enjoining Defendant's deceptive practices is proper.

**FIRST AMENDED CLASS ACTION COMPLAINT**

91.     Defendant's conduct caused and continues to cause substantial injury to Plaintiffs and the other Class Members.  Plaintiffs have suffered injury in fact as a result of Defendant's unlawful conduct, by paying more for the Products that they otherwise would have, or not purchasing it altogether.

92.     In accordance with Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

93.     Plaintiffs and the Class also seek an order for and restitution of all monies from the sale of the Products, which were unjustly acquired through acts of unlawful competition.

<u>COUNT II</u>
**California's False Advertising Law**
**Cal. Bus. & Prof. Code § 17500 ("FAL")**
**(On Behalf of Plaintiffs Bruce Horti, Sandra George, and the California Class)**

94.     Plaintiffs Bruce Horti and Sandra George reallege ("Plaintiffs" for the purposes of this section) and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

95.     Plaintiffs brings this claim individually and on behalf of the members of the California Subclass against Defendant.

96.     The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

97.     It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

98.     As alleged in detail above, the advertisements, labeling, policies, acts, and practices of Defendant relating to the Products misled consumers acting reasonably as to the ingredients and

effectiveness of the Products.

99.     Plaintiffs suffered injury in fact as a result of Defendant's actions as set forth herein because they purchased the Products in reliance on Defendant's labeling claims that under the FDCA and DSHEA amount to intentional mislabeling and misbranding of the Products.

100.    Defendant's business practices as alleged herein constitute deceptive, untrue, and misleading advertising pursuant to the FAL because Defendant has advertised the Products in a manner that is untrue and misleading, which Defendant knew or reasonably should have known, and omitted material information from its advertising.

101.    Defendant profited from its sale of the falsely and deceptively advertised Products to unwary consumers.

102.    As a result, Plaintiffs, the California Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

103.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs, on behalf of themselves and the California Class, seek an order enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Amended Complaint.

## COUNT III
### California's Consumer Legal Remedies Act
### Cal. Civ. Code § 1750 et seq. ("CLRA")
**(On Behalf of Plaintiffs Bruce Horti, Sandra George, and the California Class)**

104.    Plaintiffs Bruce Horti and Sandra George reallege ("Plaintiffs" for the purposes of this section) and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

105.    Plaintiffs bring this claim individually and on behalf of the members of the California Class against Defendant.

106.    Defendant is a "person" under the Legal Remedies Act, Cal. Civ. Code § 1761(c).

107.    Plaintiffs and Subclass members are "consumers" under the Legal Remedies Act,

Cal. Civ. Code § 1761(d).

108.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

109.    Defendant's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Products for personal, family, or household purposes by Plaintiffs and Subclass Members, and violated and continue to violate the following sections of the CLRA:

110.    § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

111.    § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

112.    § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

113.    § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

114.    Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

115.    Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

116.    Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiffs Aliva and Horti mailed Defendant a letter prior to the filing of this Amended Class Action Complaint providing notice of its alleged violations of the CLRA, demanding that Defendant correct such violations, and providing Defendant with the opportunity to correct its business practices. If Defendant does not correct its business practices, Plaintiffs will amend (or seek leave to amend) the Amended Complaint to add claims for monetary relief, including restitution and actual damages under the Consumers Legal Remedies Act.

**FIRST AMENDED CLASS ACTION COMPLAINT**

## COUNT IV
### Violation of New York General Business Law § 349
### (On Behalf Of Plaintiff Craig And The New York Class)

117.   Plaintiff Craig repeats and re-alleges the allegations above as if set forth herein.

118.   New York Business Law §349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service[.]" N.Y. GEN. BUS. LAW § 349.

119.   Defendant's actions occurred in the conduct of business, trade or commerce.

120.   Defendant's foregoing acts and practices, including its omissions, were directed at consumers.

121.   Defendant's foregoing deceptive acts and practices, including its omissions, were material, in part, because they concerned an essential part of the Products' functionality.

122.   Defendant's conduct, as described in this Amended Complaint, constitutes "deceptive acts or practices" within the meaning of the New York GBL. All of Defendant's deceptive acts and practices, which were intended to mislead consumers in a material way in the process of purchasing Defendant's Products, constitute conduct directed at consumers.

123.   As purveyors in the highly lucrative diabetic supplement market, Defendant knows that when it comes to labeling and marketing, words matter. This is why Defendant chose to name the Products "Boost Glucose Control" and to specifically represent the products "help "control glucose" and "manage blood sugar." Defendant even stated that the Products were "designed for people with diabetes".

124.   Defendant chose to label the Products in this way to impact consumer choices and to gain market dominance, as it is well aware that all consumers who purchased the Products were exposed to the aforementioned representations and would reasonably believe from these representations that the Products were legal and did in fact control glucose.

125.   As described herein, Defendant's false, deceptive and misleading label statements violate 21 U.S.C. § 343(a)(1) and the statutes adopted by many states, which deem food misbranded when "its labeling is false or misleading in any particular."

**FIRST AMENDED CLASS ACTION COMPLAINT**

126. Plaintiff Craig and the New York Class Members suffered damages when they purchased the Products. Defendant's unconscionable, deceptive and/or unfair practices caused actual damages to Plaintiffs and the New York Class Members.

127. Defendant's foregoing deceptive acts and practices, including its omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances. Consumers, including Plaintiff Craig and putative New York Class Members, would not have purchased their Products had they known Nestle did not receive FDA approval for such claims and the claims viewed in their totality implicitly or explicitly claim to mitigate, prevent disease. These claims, alone or in tandem, are deceptive and violate federal regulations.

128. As a direct and proximate result of Defendant's deceptive acts and practices, including its omissions, Plaintiff Craig and New York Class Members have been damaged as alleged herein, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

129. In addition, Plaintiff Craig and New York Class Members seek equitable and injunctive relief against Defendant on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

130. On December 6, 2021, Plaintiff Craig gave notice to Defendant of its violations of the New York General Business Law § 349.

131. Plaintiff Craig has not received a response to her letter as of the date of this filing.

## COUNT V
### Violation of New York General Business Laws § 350
### (On Behalf Of Plaintiff Craig And The New York Class)

132. Plaintiff Craig repeats and re-alleges the allegations above as if set forth herein.

133. New York Business Law §350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service[.]" N.Y. GEN. BUS. LAW § 350.

134. Defendant's actions occurred in the conduct of business, trade or commerce.

135. Defendant's foregoing acts and practices, including its advertising, were directed

**FIRST AMENDED CLASS ACTION COMPLAINT**

at consumers.

136. Defendant's conduct, as described in this Amended Complaint, constitutes "false advertising" within the meaning of the New York GBL, as Defendant publicly disseminated misleading and false advertisements through advertising and marketing statements, suggesting that their Products were FDA approved and could "control glucose."

137. Defendant's foregoing, consumer-oriented, unfair or deceptive acts and practices, including its advertising, representations, and omissions, constitute false and misleading advertising in a material way in violation of the New York's General Business Law § 350.

138. As purveyors in the highly lucrative diabetic supplement market, Defendant knows that when it comes to labeling and marketing, words matter. This is why Defendant chose to name the Products "Boost Glucose Control" and to specifically represent that the Products "help "control glucose" and "manage blood sugar. Defendant even stated that the Products were "designed for people with diabetes."

139. As described herein, Defendant's false, deceptive and misleading label statements violate 21 U.S.C. § 343(a)(1) and the statutes adopted by many states, which deem food misbranded when "its labeling is false or misleading in any particular."

140. Plaintiff Craig and the New York Class Members suffered damages when they purchased the Products. Defendant's unconscionable, deceptive and/or unfair practices caused actual damages to Plaintiffs and the New York Class Members.

141. Defendant's foregoing deceptive acts and practices, including its omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances. Consumers, including Plaintiff Craig and putative New York Class Members, would not have purchased their Products had they known Nestle did not receive FDA approval for such claims and he claims viewed in their totality implicitly or explicitly claim to mitigate or prevent disease. These claims, alone or in tandem, are deceptive and violate federal regulations.

142. As a direct and proximate result of Defendants' deceptive acts and practices, including its omissions, Plaintiff Craig and New York Class Members have been damaged as

alleged herein, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

143. Defendant's false, misleading, and deceptive advertising and representations of fact were and are directed at consumers.

144. Defendant's false, misleading, and deceptive advertising and representations of fact were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

145. Defendant's false, misleading, and deceptive advertising and representations of fact have resulted in consumer injury or harm to the public interest

146. Defendant intended that Plaintiff Craig and each of the other members of the New York Subclass would rely upon their deceptive conduct and false advertising, and a reasonable person would in fact be misled by this deceptive conduct. Defendant engaged in misleading and deceptive advertising that represented that the Products were FDA approved and "manage glucose." Defendant chose to label the Products in this way to impact consumer choices and gain market dominance, as it is aware that all consumers who purchased the Products were exposed to the representations at issue and would reasonably believe from these representations that the Products in fact help treat, cure, or prevent diabetes. Thus, Defendant's advertising and labeling was an unfair, untrue, and misleading practice.

147. Plaintiff Craig and putative New York Class Members would not have purchased their Products had they known Nestle did not receive FDA approval for such claims and the claims viewed in their totality implicitly or explicitly claim to mitigate, prevent disease. These claims, alone or in tandem, are deceptive and violate federal regulations.

148. As a direct and proximate result of Defendant's deceptive acts and practices, including its use or employment of false advertising, Plaintiff Craig and each of the other members of the New York Subclass have sustained actual damages in an amount to be proven at trial.

149. In addition, Plaintiff Craig and New York Subclass Members seek equitable and injunctive relief against Defendant on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

150.     On December 6, 2021, Plaintiff Craig gave notice to Defendant of its violations of the New York General Business Law § 350.

151.     As of the date of this filing, Plaintiff Craig has not received a response back to her letter.

152.     In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT VI
### Breach of Express Warranty
### (On Behalf Plaintiffs and the New York and California Classes)

153.     Plaintiffs repeat and re-allege the allegations above as if set forth herein.

154.     Plaintiffs, and each member of the Classes, formed a contract with Defendant at the time Plaintiffs and each member of the Classes purchased the Products.

155.     The terms of the contract include the promises and affirmations of fact made by Defendant on the Products' packaging and through marketing and advertising, as described above.

156.     This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiffs and the members of the Classes and Defendant.

157.     Defendant also made claims that were implied disease claims under 21 C.F.R. 101.93(g)(2), and therefore the Products are misbranded under 21 U.S.C. 343(r)(6). This breaches the warranties made by Defendant which Plaintiffs reasonably relied upon at the time of purchase.

158.     Plaintiffs and the members of the Classes performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

159.     Defendant breached express warranties about the Products and their qualities because Defendant's Products' representations, purports the Products control blood glucose, when it does not do so. The name of the Products, "Boost Glucose Control" represents prominently that it controls glucose, which is reinforced by the separate representation that it "helps manage blood sugar".

160. Plaintiffs and each of the members of the Classes would not have purchased the Products had they known the Products did not "control glucose", "helps manage blood sugar", nor was authorized by the FDA to make either of those claims.

161. Plaintiffs relied upon the representations made by Defendant at the time of purchase and were deprived of the benefit of the bargain as a result of Defendant's conduct.

162. On December 8, 2021, Plaintiffs Horti, Craig and Aliva gave notice to Defendant of its breach of express warranties.

163. As a result of Defendant's breach of warranty, Plaintiffs and each of the members of the Classes have been damaged in the amount of the purchase price of the Products and any consequential damages resulting from their purchases.

**COUNT VII**
**Unjust Enrichment**
**(In The Alternative To Count VI And On Behalf Plaintiffs and the New York and California Classes)**

164. Plaintiffs repeat and re-allege the allegations above as if set forth herein.

165. Plaintiffs and Class members conferred tangible and material economic benefits upon Defendant by purchasing Defendant's Products. Plaintiffs and Class members would not have purchased the Products had they not relied upon Defendant's deceptive conduct and false advertising of the Products to help "control glucose" and "manage blood sugar".

166. Defendant has been unjustly enriched in retaining the revenues derived from the purchase of the Products by Plaintiffs and the other members of the Classes.

167. Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Products was misleading to consumers, which caused injuries to Plaintiffs and the other members of the Classes, as they would have not purchased the Products if Defendant had not mislead them into believing the Products helped to "control glucose" and "manage blood sugar…"

168. Because Defendant's retention of the non-gratuitous benefits conferred on them by

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs and the other members of the Classes is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the other members of the Classes for their unjust enrichment, as ordered by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this case be certified and maintained as a class action and for judgment to be entered against Defendant as follows:

A.      Enter an order certifying the proposed Class (and subclasses, if applicable), designating Plaintiffs as the class representative, and designating the undersigned as class counsel;

B.      Enter an order awarding Plaintiffs and the class members their actual damages, treble damages, and/or any other form of monetary relief provided by law, except that no money damages are presently sought for violations of the California Consumers Legal Remedies Act and Consumer Fraud Statutes mentioned herein;

C.      Declare that Defendant is financially responsible for notifying all Class members of the mislabeling and misbranding of the Products;

D.      Declare that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale of the Products, or order Defendant to make full restitution to Plaintiffs and the members of the Class, except that no money damages are presently sought for violations of the California Consumers Legal Remedies Act;

E.      Defendant shall audit and reassess all prior customer claims regarding the Products, including claims previously denied in whole or in part;

F.      An order awarding Plaintiffs and the Classes pre-judgment and post-judgment interest as allowed under the law;

G.      Grant reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action, including expert witness fees; and

H.      Grant such other and further relief as this Court deems just and appropriate.

**FIRST AMENDED CLASS ACTION COMPLAINT**

## JURY DEMAND

Plaintiffs hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,

Dated: December 17, 2021

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**

*/s/ Alex R. Straus*
Alex R. Straus, Esq. (SBN 321366)
280 S. Beverly Drive
Beverly Hills, CA 90212
Tel.:    (917) 471-1894
Fax:    (310) 496-3176
Email: astraus@milberg.com

Nick Suciu III*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel.:    (313) 303-3472
Fax:    (865) 522-0049
Email: nsuciu@milberg.com

Daniel K. Bryson*
J. Hunter Bryson*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC, 27603
Tel: (919) 600-5000
Fax: (919)600-5035
Email: dbryson@milberg.com
Email: hbryson@milberg.com

Andrei Rado*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
405 E. 50th Street
New York, NY 10023
Tel.:    (212) 594-5300

=
**FIRST AMENDED CLASS ACTION COMPLAINT**

Fax: (865) 522-0049
Email: *arado@milberg.com*

Rado


Zoe Aaron*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
405 E. 50th Street
New York, NY 10023
Tel.: (212) 594-5300
Fax: (865) 522-0049
Email: *zaaron@milberg.com*


*Attorneys for the Plaintiffs
and the Proposed Class
*Pro hac vice forthcoming*